**Karen SCHULTE and Margaret Nardo, Individually and as Representatives of the Class of Psychiatric Social Workers, Plaintiffs,**

**v.**

**The STATE OF NEW YORK et al., Defendants.**

**No. CV 80–0053.**

United States District Court, E. D. New York.

Sept. 29, 1981.

---

Efman & Naiburg, Hauppauge, N. Y., for plaintiffs.

Robert Abrams, Atty. Gen. of New York by Andrea G. Iason and Howard L. Zwickel, New York City, for defendants.

## MEMORANDUM AND ORDER

GEORGE C. PRATT, District Judge:

At the last conference held in this action, both parties sought leave to make motions prior to the trial. The court agreed to remove the case from its trial calendar and established August 5, 1981 as the return date for the cross-motions. The papers have since been received, and the motions are now ripe for decision.

Defendants move for summary judgment on the grounds that plaintiffs' causes of action are untimely, that no private right of action exists against the state under the Equal Pay Act, 29 U.S.C. § 206, and that the undisputed facts set forth in the pretrial order entitle defendants to judgment in their favor. Plaintiffs move for an order certifying this as a class action pursuant to FRCP 23.

## I. STATUTORY ARGUMENTS

### A. *Title VII Claims.*

Defendants argue that both plaintiffs have failed to comply with the prerequisites for bringing a Title VII action and are, therefore, barred from asserting their Title VII claims.

■ Plaintiff Schulte was hired as a psychiatric social worker (hereinafter "social worker") in December 1974. On August 10, 1979, Schulte filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) alleging that the state's pay scales for Psychologist I and Social Worker I and II discriminated against females. Schulte alleged that whereas the positions of psychologist and social worker were similar in duties and responsibilities, psychologists, who were predominately males, were paid at a higher rate than the social workers, who were predominately females. Schulte's EEOC charge alleged that January 1979 was the date on which the "most recent or continuing discrimination took place". Defendants' memorandum, Ex. A.

Title VII of the Civil Rights Act of 1964 provides that an aggrieved person must file a complaint with the EEOC "within 180 days after the alleged unlawful employment practice occurred". Defendants contend that the alleged unlawful employment practice occurred at the time plaintiff Schulte was hired in 1975, and that her claim is barred because she did not file her charge with the EEOC until 1979. Plaintiffs urge that the acts of discrimination complained of are a continuing violation that result in an on-going denial of equal terms and conditions of employment. Defendants respond that any post-employments acts "are merely an *effect* of being hired and classified in a certain position with certain grade and salary" and are not separate discriminatory acts for purposes of Title VII. Defendants' memorandum at 16.

In the Supreme Court's recent decision in *Delaware State College v. Ricks*, 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980), plaintiff was notified that he had been denied tenure and instead would be offered a one-year terminal contract. Plaintiff had filed a petition with the grievance committee, and the letter notifying him that he would be offered a one-year terminal contract noted that "should the Educational Policy Committee decide to recommend that you be granted tenure, and should the Board of Trustees concur with their recommendation, then of course, it will supersede any previous action taken by the board." 101 S.Ct. at 502 n.2. Eventually, plaintiff's grievance petition was denied, and he was terminated pursuant to the one-year contract. Ricks' claim with the EEOC, alleging discrimination on the basis of national origin, was filed more than 180 days after he had been notified of the decision to deny tenure and to offer a one-year terminal contract, but less than 180 days after his employment actually terminated.

The Supreme Court held that the alleged unlawful employment practice occurred when plaintiff was notified that he had been denied tenure; it rejected plaintiff's argument that the discriminatory practice had continued up until the point where he was actually terminated. For purposes of computing the limitations period, the Court noted that:

> "The proper focus is upon the time of the *discriminatory acts*, not upon the time at which the *consequences* of the acts become more painful." * * * It is simply insufficient for Ricks to allege that his termination "gives present effect to the past illegal act and therefore perpetuates the consequences of forbidden discrimination." * * * The emphasis is not upon the effects of earlier employment decisions; rather, it "is [upon] whether any present *violation* exists." 101 S.Ct. at 504 (citations omitted) (emphasis in original).

Defendants urge that this case is controlled by *Ricks* because it was upon hiring that plaintiff Schulte was subjected to the alleged unlawful employment practice, and no further independent acts of discrimination are shown after the initial job classification was made. Plaintiffs respond that because plaintiff Schulte's charge filed with

the EEOC alleges that she is "being denied equal terms and conditions of employment", she has alleged a continuing violation. Moreover, plaintiffs emphasize that the complaint seeks to enjoin sex discrimination "with respect to compensation, fringe benefits, terms and conditions of employment, methods of hiring, assignments, job classification, promotions and transfer policies." Complaint, ¶ 5.

The court does not read *Ricks* as broadly as do defendants. *Ricks* was a discharge case, where a specific identifiable act can be said to have given rise to the cause of action for wrongful discharge. The claims alleged in this action relate to on-going terms and conditions of employment, primarily salary, and not to any discrete, identifiable act of discrimination. If a cause of action for discriminatory terms and conditions of employment accrued only upon hiring, then anyone who did not bring a claim within six months of hiring would be forever barred from complaining of all those discriminatory conditions which existed at the time of hiring. To require a newly hired employee to challenge the new employer almost immediately is unrealistic. Moreover, it is unlikely that the Supreme Court intended in *Ricks* to impose such a far reaching change in the law, and this court declines to extend *Ricks* beyond the discharge situation to this cause of action grounded in continuing conditions of employment.

For these reasons, the court concludes that plaintiff Schulte's Title VII cause of action is not barred by the statute of limitations, and defendants' motion for summary judgment on this basis must be denied.

■ Defendants have also moved to dismiss the Title VII claim of plaintiff Nardo, arguing that she has not fulfilled any of the jurisdictional prerequisites to a Title VII action. Plaintiff Nardo states by affidavit that she accompanied plaintiff Schulte to the office of the EEOC when plaintiff Schulte filed her discrimination charge, and that the EEOC instructed her that it would be unnecessary for each plaintiff to fill out a separate charge form. Nardo aff., May 7, 1980. Plaintiffs state that as long as one plaintiff has fulfilled the procedural prerequisites, that plaintiff may maintain a class action on behalf of all other similarly situated persons. Thus, plaintiffs appear to concede by their own argument that plaintiff Nardo cannot assert her Title VII claim in her own right.

The court concludes that plaintiff Nardo is barred from bringing an individual Title VII claim, and the motion to dismiss her claim standing alone must be granted. This ruling does not exclude plaintiff Nardo from the class sought to be certified by plaintiffs, if the court should decide that class action treatment is appropriate.

B. *Equal Pay Act Claims*

Defendants argue that plaintiffs' claims under the Equal Pay Act (EPA) are (1) time-barred, (2) precluded because the statutory prerequisites have not been met, and (3) are barred under the 10th and 11th amendments.

■ A cause of action under the EPA is governed by a two-year statute of limitations, unless a willful violation is alleged, in which case a three-year statute of limitations applies. 29 U.S.C. § 255. The statute further provides that an action is deemed commenced once a complaint and a written consent to become a party plaintiff are filed with the court. 29 U.S.C. § 256. If a complaint is filed without a written consent, the cause of action is not deemed commenced until "the subsequent date on which such written consent is filed in the court in which the action is commenced." 29 U.S.C. § 256(b). Defendants seek dismissal because no written consents have been filed to date. Plaintiffs do not address this contention in their opposition papers.

A review of the clerk's file in this action indicates that plaintiff Schulte signed, under oath, an individual verification form annexed to the complaint. The verification states only that plaintiff Schulte believes the complaint's allegations to be true. At least one court has held that such a state-

ment, under oath, substantially complies with the statutory "consent form" requirement, *Burrell v. LaFollette Coach Lines*, 97 F.Supp. 279 (D.C.Tenn.1951), and this court agrees. There is nothing in the clerk's file that could be construed as written consent on behalf of plaintiff Nardo, although the statute plainly provides that plaintiff Nardo's cause of action would be deemed commenced even at this stage upon filing of such a consent form. The court, therefore, concludes that to date only plaintiff Schulte has commenced a cause of action under the EPA, although plaintiff Nardo might still file her written consent to commence her action.

■ Defendants next argue that plaintiffs' causes of action accrued upon hiring, and are, therefore, barred even if the three-year statute of limitations for "wilfull" violations applies. Defendants rely on *Delaware State College v. Ricks, supra*, in support of their argument. This court has already concluded that *Ricks* does not apply to these facts, where plaintiffs are challenging on-going terms and conditions of employment. Moreover, numerous courts have concluded that challenges to discriminatory pay practices under the EPA are continuing violations that accrue on each regular payday. *E.g., Hodgson v. Behrens Drug Company*, 475 F.2d 1041 (CA5), *cert. denied*, 414 U.S. 822, 94 S.Ct. 121, 38 L.Ed.2d 55 (1973); *Soler v. G & U, Inc.*, 86 F.R.D. 524 (SDNY 1980). The court, therefore, concludes that plaintiffs' causes of action under the EPA are not barred by the statute of limitations.

■ Defendants' next argument, that there are constitutional impediments to a private action against the state under the EPA, is more troublesome. The EPA, as part of the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 *et seq.*, covers only those employers who are subject to the FLSA. 29 U.S.C. § 206(d)(1); *County of Washington v. Gunther*, 452 U.S. 161, 167, 101 S.Ct. 2242, 2246, 68 L.Ed.2d 751 (1981). Relying on *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), defendants assert that application of the EPA to state employees is precluded.

In *National League of Cities*, the Supreme Court held that the 1974 amendments to the FLSA, insofar as they extended the act's provisions to nearly all public employees, impermissibly infringed upon state and local governments' "dual functions of administering the public law and furnishing public services". 426 U.S. at 851, 96 S.Ct. at 2474 (footnote omitted). The Court, therefore, concluded that Congress was beyond its powers under the commerce clause to bring state employees within the ambit of the FLSA. However, the court left open the question of:

> whether different results might obtain if Congress seeks to affect integral operations of state governments by exercising authority granted it under other sections of the Constitution such as the spending power, Art. I, § 8, cl. 1, or § 5 of the Fourteenth Amendment. *National League of Cities, supra*, at 852 n.17, 96 S.Ct. at 2474 n.17.

Cases following *National League of Cities* have not extended the Supreme Court's holding to actions against the states under the EPA. Some courts have concluded that the EPA was a valid exercise of congressional power pursuant to § 5 of the fourteenth amendment, *e.g., Usery v. Allegheny County Inst. Dist.*, 544 F.2d 148 (CA3 1976). Other courts have concluded that the EPA portion of the FLSA is a valid congressional exercise of the commerce clause power, *e.g., Usery v. Dallas Ind. School Dist.*, 421 F.Supp. 111 (ND Tex 1976); *Christiansen v. State of Iowa*, 417 F.Supp. 423 (ND Iowa 1976). Still other courts have held "that Congress had the power to extend the equal pay provisions of the FLSA to the states and their political subdivisions pursuant to both the Commerce Clause and the Fourteenth Amendment." *Usery v. Edward J. Meyer Memorial Hospital*, 428 F.Supp. 1368 (WDNY 1977). In particular, *Usery v. Edward J. Meyer Memorial Hospital, supra*, exhaustively analyzes dozens of cases following the Supreme Court's decision in *National League of Cities, supra*, which are nearly uniform in their conclusion that the

EPA applies to a state and its political subdivisions, although the reasoning employed in these cases differs widely.

Defendants urge this court to reject these lower court holdings in light of the Supreme Court's recent decision in *Pennhurst State Hospital v. Haldeman*, 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981). In *Pennhurst*, the Court held that in enacting the Developmentally Disabled Assistance & Bill of Rights Act, 42 U.S.C. § 6000 *et seq.*, Congress did not *sub silentio* intend to act under its authority pursuant to § 5 of the fourteenth amendment. 101 S.Ct. at 1539. Defendants argue that unless Congress expressly articulates its intention to legislate pursuant to the fourteenth amendment, such intent may not, under any circumstances, be implied.

This court disagrees that *Pennhurst* should be read as an absolute bar to discerning congressional intent absent an express statement by Congress. Viewed from the perspective of the instant case, *Pennhurst* is distinguishable. The Supreme Court there noted only that it would be "less likely" to infer intent in a case such as *Pennhurst*, where affirmative obligations would have been imposed on the states if the statute were interpreted in the manner that was urged. 101 S.Ct. at 1539. In fact, the Court indicated that it would be far more likely to infer congressional intent where the statute at issue simply prohibited specific types of conduct. Thus, the EPA presents a stronger case for inferring congressional intent to legislate under the fourteenth amendment since the EPA basically prohibits discriminatory employment practices. Moreover, the discrimination sought to be remedied by the EPA is more akin to traditional fourteenth amendment values than the conduct at issue in *Pennhurst*.

Even if this court were to conclude that *Pennhurst* should be read in the manner urged by defendants, this argument does not affect the holding of those courts that have concluded that the EPA is a valid exercise under Congress' commerce clause powers. The particular provisions of the FLSA found to be unconstitutional in *National League of Cities, supra*, relate far more directly to traditional state functions than do the provisions of the EPA, and the EPA presents a stronger case for upholding congress' power under the commerce clause. At the very least, it is unclear whether the Supreme Court would extend its holding in *National League of Cities* to the EPA.

The court concludes that a private cause of action against a state for an equal pay act violation is not precluded by either *National League of Cities* or *Pennhurst*, and defendants' motion for summary judgment on this basis must be denied.

## II. MOTION FOR CLASS CERTIFICATION

Although this action has been pending since January 1980, only now have plaintiffs moved for class certification pursuant to FRCP 23. At the pretrial conference, plaintiffs' counsel indicated that since defendants had never voiced any opposition to class certification, he assumed that this action would proceed as a class action. However, when the court pointed out that no motion for certification had ever been made, nor was it clear that the prerequisites for a class action were satisfied, plaintiffs sought and received leave to move for class certification at this late date.

Plaintiffs seek to certify a class comprised of:

All persons employed by defendants as Psychiatric Social Workers and who hold the job title Psychiatric Social Worker I and Psychiatric Social Worker II and who have earned the degree of Masters of Social Work from an accredited institution. Plaintiffs' memorandum at 1–2.

Plaintiffs assert that all of the prerequisites for a class action exist under FRCP 23(b)(1), (2) *and* (3). Such an indiscriminate argument demonstrates a lack of understanding of the rather exacting requirements necessary for class certification under either 23(b)(1), (b)(2), *or* (b)(3).

Before class action may be maintained under Rule 23, the action must meet the

requirements of 23(a) and one set of the alternate requirements of 23(b). The 23(a) criteria include a showing that the class representatives have claims or defenses "typical of the claims or defenses of the class", and that they "will fairly and adequately protect the interests of the class".

The court has previously concluded that plaintiff Nardo's Title VII claim, and, at present, her EPA claim, are barred; thus, she cannot be said to be a representative plaintiff. Moreover, plaintiffs have not brought any facts to this court's attention that demonstrate why plaintiff Schulte is a typical plaintiff who will fairly and adequately protect the interests of the remainder of the class. For example, the court has no way of knowing whether Schulte's educational background, prior job experience, or actual duties as a psychiatric social worker are typical of other proposed class members' experiences.

More significantly, approximately one-third of the proposed class include *male* social workers. Plaintiffs do not even grapple with the perplexing question of how a proposed class seeking to remedy sex discrimination against women can include one-third males. Based on this fact alone, the court concludes that plaintiff Schulte cannot possibly be a typical plaintiff who can fairly and adequately protect the interests of the proposed class.

Defendants advance an additional argument opposing class certification based on the untimeliness of the instant motion. Rule 23(c) states that if an action is to be maintained as a class action, such a determination should be made "as soon as practicable after the commencement of an action." Plaintiffs have plainly failed to comply with this requirement, and to permit this action to proceed as a class action now would only lead to further delay, since notice would have to be sent to class members and an opportunity given to individual class members to "opt out" of the class. Because

class certification would unduly delay these proceedings, the motion to certify a plaintiff class should be denied on this ground as well.

Accordingly, the motion for certification of the plaintiff class is denied. Since the court has determined that class certification would be inappropriate, the court need not address defendants' argument that a class action is precluded in an action brought under the Equal Pay Act.

### III. MOTION FOR SUMMARY JUDGMENT

■ Defendants contend that the evidence upon which plaintiffs will rely to establish their sex discrimination claims is insufficient as a matter of law. The uncontested facts relied on by defendants in support of their motion are as follows:

(1) As of February 4, 1981 there were 1,093 psychologists employed by the New York State Office of Mental Health. 67% of the psychologists are male; 31% are female; 2% are unknown.

(2) As of February 4, 1981 there were a total of 1,332 social workers employed by the New York Office of Mental Health. 29% of the social workers are male; 70% are female; 1% are unknown.[1]

(3) The pay scale for psychologists is higher than the pay scale for social workers.

(4) The minimum qualifications for Psychiatric Social Worker I include a masters degree in social work. The minimum qualifications for Psychiatric Social Worker II include a masters degree in social work and two years of social case work experience, one year of which must have been after receipt of the masters degree.

(5) The minimum qualifications for Psychologist I include a masters degree in psychology and two years of professionally supervised experience in psychology, one year

---

1. The figures set forth in (1) and (2) are those provided by plaintiffs. Defendants' figures show five more psychologists than do plaintiffs; and 116 more psychiatric social workers than do plaintiffs, with a higher percentage of males and a lower percentage of females than the figures provided by plaintiffs. The court has relied upon plaintiffs' figures for purposes of the instant motion.

of which must have been after receipt of the masters degree. The minimum qualifications for Psychologist II are a masters degree in psychology and three years of professionally supervised experience in psychology, two years of which must have been after receipt of the masters degree. The minimum qualifications for Associate Psychologist include completion of all the requirements for a doctoral degree in psychology, including an internship.

(6) Male and female social workers are paid the same starting salary and are entitled to the same annual increments. Male and female psychologists are paid the same starting salary, and also are entitled to the same annual increments.

(7) The percentage of female social workers hired by the state, 70%, roughly parallels the percentage of women who graduate from graduate degree social work programs within the United States. In 1975 approximately 65% of all masters degrees in social work were awarded to women; in 1979, the percentage of women had increased to 72.5%.

(8) A comparison of the job market for psychologists with the job market for social workers throughout the United States indicates that psychologists are paid a higher starting salary than social workers in every state.

(9) The job descriptions for psychologist and social workers established by the New York State Civil Service Commission are substantially different.

Notwithstanding the different job descriptions, pay scales, and qualifications, plaintiffs seek to prove at trial that the work actually performed by social workers and psychologists is substantially similar, if not identical. The instant motion is premised on defendants' contention that even if plaintiffs prevail on this issue at trial, they will not have proved that the different treatment accorded to psychologists and social workers results from unlawful sex discrimination.

After reviewing the relevant caselaw and statutory provisions, the court concludes that plaintiffs' case fails to establish a valid sex discrimination claim. In reaching this determination, the court places considerable emphasis upon the large number of social workers who are male (29%) and the large number of psychologists who are female (31%). Plaintiffs do not contend that the state in any way discriminates in its hiring decisions within each job classification; it is not disputed that the job titles of both social worker and psychologist are filled without regard to the sex of the individual applicants. Because there is such a substantial representation of the "minority sex" within each job classification, the court finds that even if psychologists and social workers perform identical work, the fact that they are paid different salaries does not establish sex discrimination.

Moreover, the educational background and professional training of psychologists and social workers differ. A comparison of the relative statistics indicates that psychologists have been and continue to be compensated at a higher average rate than social workers throughout the United States. Plaintiffs do not intend to adduce at trial any evidence indicating that job advancements, salary increases, or any of the terms and conditions of employment favor one sex over the other sex within the class of social workers or within the class of psychologists. Rather, plaintiffs' evidence at trial would be directed at the similarities between the actual job performance of psychologists and social workers.

Merely establishing that the state employs more women as social workers and more men as psychologists, even if the two groups perform equal work, does not bring this case within *Corning Glass Works v. Brennan*, 417 U.S. 188, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974). While that case recognized that a *prima facie* case under the Equal Pay Act is set forth by a showing that employees of opposite sexes are paid different wages for equal work, neither *Corning* nor, in this court's opinion, the EPA, was intended to address the situation where the employer pays different wages to two different job classifications, each of which include both men and women. Such

an interpretation would extend the EPA even beyond the broad remedial purposes identified by the Court in *Corning* to include claims of underpayment by any employee even when unrelated to the sex discrimination claims sought to be remedied by the EPA.

The implementing regulations note that because the EPA

> was designed to eliminate wage rate differentials which are based on sex, situations will be carefully scrutinized where employees of *only one sex* are concentrated in the lower grades of the wage scale, and where there does not appear to be any material relationship other than sex between the lower wage rates paid to such employees and the higher rates paid to employees of the opposite sex. * * * *Differentials in entrance rates will not constitute a violation of the equal pay principle if the factors taken into consideration in determining which rate is to be paid each employee are applied equally to men and women.* 29 CFR § 800.115 (1980) (emphasis added).

This regulation indicates that the EPA was not intended to extend to claims by one group of employees that they are paid less than another group when each group includes significant numbers from each sex, and there is no claim that members of either sex are treated differently within each classification. Nor do the cases cited by plaintiffs contradict this proposition, since all involved challenges to job classification schemes involving one group of male employees and one group of female employees. *Laffey v. Northwest Airlines, Inc.*, 567 F.2d 429 (D.C.Cir.1976) (female airline stewardesses and male pursers); *Peltier v. City of Fargo*, 533 F.2d 374 (CA8 1976) (female "car markers" and male patrol officers); *Usery v. Allegheny County Institution Dist.*, 544 F.2d 148 (CA3 1976) (female beauticians and male barbers); *Brennan v. Prince William Hospital Corp.*, 503 F.2d 282 (CA4 1974) (female nurses aides and male floor orderlies); *Schultz v. Wheaton Glass Company*, 421 F.2d 259 (CA3 1970) (female selector-packers and male selector-packers). Since the job classification scheme under attack by plaintiffs in this case includes approximately one-third of the minority sex in each job classification, the cases relied upon by plaintiffs are all distinguishable on that basis alone.

Nor does the Supreme Court's recent decision in *County of Washington v. Gunther*, 452 U.S. 161, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981) provide a basis for relief for plaintiffs in this action. To the extent that *Gunther* is properly read as extending the parameters of a sex discrimination claim, a key element present in *Gunther* and missing here is the existence of two separate wage scales for male and female workers.

The court concludes that even if plaintiffs were to succeed on their claim that psychologists and social workers perform equal work for the New York State Office of Mental Health, the fact that wage differentials exist between the two classifications is not evidence of sex discrimination for purposes of Title VII or the EPA. While it may be that the state is unwise in having two different job classifications if there is only one task to be performed (a proposition hotly contested by defendants), this decision cannot be attributed to sex discrimination when each job classification includes substantial numbers of each sex, and there is no claim that members of each sex are not treated equally within each job classification.

Accordingly, defendants' motion for summary judgment on all of the causes of action is granted, and the clerk shall enter judgment dismissing the complaint.

SO ORDERED.