**Hahmod ZENNI, Plaintiff,**

v.

**HARD ROCK CAFE INTERNATIONAL, INC., (N.Y.), Defendant.**

**No. 93 Civ. 8409 (PKL).**

United States District Court, S.D. New York.

Nov. 15, 1995.

Raymond F. Gregory, New York City, for Plaintiff.

Roberts & Finger, LLP, New York City (Allen B. Roberts, Michael B. Pappas, of counsel), for Defendant.

## OPINION AND ORDER

LEISURE, District Judge:

This is an action brought by Hahmod Zenni ("Zenni" or "plaintiff") against his former employer, Hard Rock Cafe International, Inc. (N.Y.) ("Hard Rock" or "defendant"). In his amended complaint, plaintiff alleges that he was discriminated against, and denied a job promotion by, Hard Rock because he is an African–American.[1] In addition, plaintiff alleges that he was unlawfully terminated in retaliation for filing a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC").[2] Plaintiff seeks, as remedies, compensatory and punitive damages, backpay, reinstatement, a permanent injunction preventing defendant from engaging in unlawful acts which discriminate against plaintiff on the basis of race, and attorney's fees.

Pursuant to Rule 56(b) of the Federal Rules of Civil Procedure, defendant moves for summary judgment. For the reasons stated below, defendant's motion is granted in its entirety.

## BACKGROUND

Hard Rock operates a large restaurant located on West 57th Street in New York City. Hard Rock employs approximately 200 persons in various departments, including Management, Host, Outdoor Host, Server, Merchandise, Bartender, Busser, Kitchen Administration, Expediter, and others. *See* Affidavit of Jack Moran ("Moran Aff.") ¶ 3 As is the case with most restaurants, high-quality customer service is extremely important to Hard Rock. The Hard Rock employee manual stresses the importance of all employees working together as a team, keeping a positive, upbeat attitude, and always being polite to customers, regardless of the situation. *See id.* Ex. 1 at 18–20.

From August of 1987 until October of 1991, Zenni worked on the premises of Hard Rock as a security guard for an independently owned and operated company, Dacrem Security ("Dacrem"). *See* Deposition of Hahmod Zenni ("Zenni Dep.") at 139–41. As a security person for Dacrem, plaintiff was stationed outside the front of the restaurant, and he had continual contact with Hard Rock customers waiting in line and entering the restaurant, and with Hard Rock employees. *See* Affidavit of Hahmod Zenni ("Zenni Aff.") ¶ 2.

In October of 1991, Zenni inquired with Hard Rock managers whether any positions inside the restaurant were then available. Zenni was told that a Host position was available, and he was hired as a Host by Hard Rock on October 22, 1991. *See* Zenni Dep. at 147, 150, 177–78.[3] About one month after being hired as a Host, plaintiff first expressed interest in being considered for the position of Server, which is Hard Rock's term for waiter. *Id.* at 147. He was informed by Hard Rock that persons with no previous Server experience are generally asked to work as an Expediter before becoming a Server and that there was at the time a list of other employees who had expressed interest in the Expediter job before him. *See id.* at 200.[4] Expediters are responsible for arranging food on the plates after it comes from the kitchen and helping Servers run food to the tables. *See id.* at 169–72.

1. Throughout his brief, plaintiff uses the term "African–American." Defendant, in its briefs, uses the term "Black," because it has several employees who are Black, and not United States citizens (and therefore technically not "African–Americans"). For purposes of consistency, the Court will use the term "African–American."

2. Zenni alleges that defendant's employment practices violated: (1) Title VII of the Civil Rights Act of 1964, *see* 42 U.S.C. §§ 2000e–2(a)(1) and 3(a); (2) the Civil Rights Act of 1866, *see* 42 U.S.C. § 1981; and (3) the New York Human Rights Law, *see* N.Y.Exec.Law § 296 (McKinney 1993 & Supp.1995).

3. During his first two months of employment with Hard Rock, plaintiff continued to work part-time for Dacrem. *See* Defendant's 3(g) Statement ¶ 14.

4. Zenni's name was apparently placed on a list of employees requesting promotion to Expediter. Zenni alleges that when he inquired about the list in January of 1991, he was informed that the list had been abolished and that promotions were "up to the managers." *See* Zenni Dep. at 202.

Shortly after beginning work as a Host at Hard Rock, and before he mentioned interest in the Server position, plaintiff's conduct became an issue in two, separate work-related incidents. First, on October 24, 1991, two days after beginning his employment, plaintiff was issued a written Notice of Disciplinary Action for being rude to a guest at a private party hosted by Hard Rock. *See id.* Ex. O. In addition, on November 9, 1991, Zenni was cited in a Hard Rock "shopper's report" for being rude to a guest. *See* Affidavit of Jamie T. Strobino ¶ 5 & Ex. 1.[5]

In December of 1991, two months after beginning his employment, Zenni received his first biannual written evaluation as a Host. While his overall evaluation indicated that he was "meeting the high standards" of Hard Rock, his evaluations were substandard in the areas of customer relations, attitude about Hard Rock and other employees, and maintaining a positive attitude. *See* Zenni Dep.Ex. O. In hand-written comments, the supervisor reviewing Zenni wrote "Good desk skills, but needs to curb abruptness when under stress. Must improve on relationships with other Hosts. Treat all w/Respect." The reviewer also wrote "Keep up the good work—I am impressed so far with your focus + willingness to work hard." *Id.* Apparently agreeing with Hard Rock's initial assessment of his performance, plaintiff, in his first self-evaluation prepared sometime after his employer-prepared evaluation, gave himself substandard evaluations in the areas of teamwork and communications. *See* Zenni Aff.Ex. C.

In February of 1992, Zenni's fourth full month as a Hard Rock employee, he received more complaints about his job performance. First, Hard Rock records indicate that four Servers complained to management about Zenni's "attitude, rudeness, [and] inconsiderate behavior." *See* Zenni Dep.Ex. F. The Servers also complained that plaintiff was not seating guests evenly throughout the dining room, thus affecting their ability to earn tips. Zenni's managers mentioned the complaints to him, and Zenni resolved the problem by personally telling each Server that he would do his best to make sure the seating of customers would be fair and equitable. *See* Zenni Aff. ¶ 10.

On February 17, 1992, Hard Rock received a complaint from a guest that plaintiff had been rude to her. According to his deposition testimony, plaintiff told a customer waiting to be seated, "Would you please go back to the bar? I'm trying to do a job here." Zenni Dep. at 618. For the second time in four months, plaintiff was issued a written Notice of Disciplinary Action. *See id.* Ex. P. Plaintiff was suspended for three days as a result of this incident. *See id.* The Notice also stated that plaintiff's next infraction would result in termination.

On April 25, 1992, plaintiff became involved in an argument with a co-worker on the floor of the restaurant. While the conduct did not result in any punishment, it was written up in the Staff Contact Sheet. *See id.* Ex. F. The written comment said, "Hammond [sic] cannot control temper and seems 'stuck' on being right."

In June of 1992, approximately eight months after beginning his employment, plaintiff received his second biannual written evaluation. His overall score indicates that plaintiff was no longer meeting the standards of Hard Rock. *See* Zenni Dep.Ex. H.[6] Plaintiff fell below Hard Rock standards in teamwork, friendliness, customer relations, poise, communication, following directions, positive attitude, attitude about Hard Rock, and pride in Hard Rock. *Id.*

Hand-written comments on the evaluation sheet indicate that plaintiff possessed some positive qualities as an employee. He was described as "purposeful and focused," "intelligent," "self-confident," and "magnetic." However, in the space listing areas to im-

---

5. Shopper's reports are reports by individuals hired by Hard Rock to attend the restaurant anonymously as guests and grade the service they receive. *See id.* ¶ 3; Zenni Aff. at 610–11.

6. Because the employment dates (which this evaluation form purportedly cover) were not clearly written on the form, it is not entirely clear from the form that this is in fact Zenni's second evaluation. However, since Zenni raises no objection to defendant's assertion, the Court will treat it as the second evaluation.

prove, the supervisor mentioned communication, attitude, friendliness, and compassion. The written evaluation ended with the following:

Hahmod displays the signs of a "persecution complex" and feeds it whenever given the chance. We cannot continue to allow Hahmod to work in this dept. unless he desires to improve his people skills ... and we see the immediate effects. Currently classified as a high maintenance employee.

*Id.* Plaintiff, in his self-evaluation, gave himself low marks in communication and friendliness. *See id.* Ex. M. In his written comments, he acknowledged he had made mistakes, but believed he had worked to rectify them. In addition, he stated that it was "hard to stay pro[ud] of a company that hasn't hired but two black employees into any money positions in the four years that I've been here." *Id.*

In September of 1992, Hard Rock discontinued its relationship with Dacrem, and created its own security department. The Hard Rock security position is called "Outdoor Host." Plaintiff asked for and received some shifts as an Outdoor Host, in addition to his duties as a regular indoor Host. *See* Moran Aff.Ex. 4.

Sometime in October or November of 1992, plaintiff approached the Assistant General Manager of Hard Rock and again requested that he be named an Expediter. *See* Zenni Dep. at 213. After being told that his request for promotion had been discussed and rejected at the manager's meeting, plaintiff filed a charge of discrimination with the EEOC on November 16, 1992, alleging that he was denied promotion to the Expediter position because of his race. *See id.* at 311. Plaintiff continued to work for Hard Rock after filing the charge; however, on November 30, 1992, he requested to work only as an Outdoor Host. *See* Defendant's 3(g) ¶ 64. This request was granted.

After filing his EEOC charge, it is undisputed that plaintiff's attitude became even worse. Plaintiff did not smile, cut off communication with other employees, and had to suppress the urge to hurt anyone associated with Hard Rock. *See* Zenni Dep. at 407, 543–44; Zenni Aff. ¶ 16. In addition, plaintiff reduced his work schedule at Hard Rock from five days to three days per week. *See* Defendant's 3(g) Statement ¶ 68; Plaintiff's 3(g) Statement ¶ 33. Plaintiff states that the worsening of his attitude, and his decision to work part-time, were caused by the hostile atmosphere at work that he faced after filing his the EEOC charge. *Id.*

In December of 1992, shortly after filing his EEOC charge, plaintiff received his third biannual evaluation, which was even more critical than the first two. *See* Zenni Dep. Ex. I. His overall evaluation, like his second evaluation, stated that he was not meeting the standards of the Hard Rock. Again, the criticism focused on plaintiff's attitude, cooperativeness, and lack of people skills. *See id.;* Moran Aff. ¶ 11 & Ex. 6. Zenni's self-evaluation also concluded that he was not meeting Hard Rock's standards. *See* Zenni Dep.Ex. I.

On January 27, 1993, plaintiff received his third and final Notice of Disciplinary Action, which was in response to a letter written by customers who claimed that plaintiff had barred them from access to the restaurant and had been rude to them. *See id.* Ex. S. Two co-employees wrote letters to management describing the incident. *See* Moran Aff.Ex. 8 (letters from Joseph Mieczkowski and Penny DePhillip). While the letters indicate that plaintiff eventually allowed the patrons into the restaurant, they do not defend him against the charge of rudeness. The result of this conduct is that plaintiff was again suspended for three days, and was also put on probation for sixty days. *See* Zenni Dep.Ex. S. When the General Manager Nevin Hofing informed him of the suspension, plaintiff called him an "asshole." *See id.* at 570.

On November 7, 1993, two incidents occurred which led to plaintiff's termination of employment. *See* Zenni Dep.Ex. Q. First, plaintiff engaged in a "shouting match" with a Hard Rock chef in full hearing of customers and other employees. Plaintiff admits that he told the chef, "Don't fuck with me." *Id.* at 541. Plaintiff states that the chef had been trying to provoke him into conduct

which would get him terminated. *See* Zenni Aff. ¶ 20.

Approximately one hour after the altercation with the chef, a Hard Rock manager was told by a customer that plaintiff had been abrupt and rude to her and her group of children, refusing to let them enter the restaurant and making them wait outside in the cold. *See* Defendant's 3(g) ¶ 82. The guest later wrote a letter of complaint. *See* Moran Aff.Ex. 12.

After requesting and receiving a few weeks of work off following the incident, defendant finally met with Hofing to discuss what happened on November 22, 1993. After the discussion, Hofing terminated plaintiff's employment with Hard Rock. *See* Zenni Dep.Ex. Q. On December 6, 1993, plaintiff filed a second charge with the EEOC, alleging that he was terminated in retaliation for filing his initial charge a year earlier on November 22, 1993.

### *DISCUSSION*

I. *The Standard for Summary Judgment*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986); *Lang v. Retirement Living Pub. Co.,* 949 F.2d 576, 580 (2d Cir.1991). The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment. *See, e.g., Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point

to an absence of evidence to support an essential element of the nonmoving party's claim." *Goenaga,* 51 F.3d at 18 (citing *Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53). In assessing the record to determine whether there is a genuine issue as to any material fact, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513. However, a court draws all inferences in favor of the nonmoving party only after determining that such inferences are reasonable, considering all the evidence presented. *See, e.g., Apex Oil Co. v. DiMauro,* 822 F.2d 246, 252 (2d Cir.), *cert. denied,* 484 U.S. 977, 108 S.Ct. 489, 98 L.Ed.2d 487 (1987). The trial judge's function in response to a summary judgment motion is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *See Gallo v. Prudential Residential Servs., Ltd. Partnership,* 22 F.3d 1219, 1224 (2d Cir.1994). However, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson,* 477 U.S. at 247–48, 106 S.Ct. at 2509–10 (emphasis in original). Unsupported allegations will not suffice to create a genuine issue of material fact; rather, there must be sufficient evidence to allow a reasonable jury to find in favor of the non-moving party. *See id.; Goenaga,* 51 F.3d at 18. "The motion 'will not be defeated' merely ... on the basis of conjecture or surmise." *Goenaga,* 51 F.3d at 18 (quoting *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.), *cert. denied,* 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991)).

### II. *Plaintiff's Failure to Promote Claim*

■ Title VII forbids employers from discriminating "against any individual with respect to ... compensation, terms, conditions, or privileges of employment, because of such individual's race...." 42 U.S.C. § 2000e–2(a)(1). In a Title VII employment discrimination case,[7] the plaintiff has the initial bur-

---

7. In addition to his Title VII claim, plaintiff has

alleged unlawful employment discrimination in

den of establishing a prima facie case of discrimination. *See St. Mary's Honor Ctr. v. Hicks,* —— U.S. ——, ——–——, 113 S.Ct. 2742, 2746–47, 125 L.Ed.2d 407 (1993); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); *Cronin v. Aetna Life Ins. Co.,* 46 F.3d 196, 203 (2d Cir.1995). The burden on a plaintiff to meet the requirements of a prima facie case is *de minimus. See, e.g., Cronin,* 46 F.3d at 196; *Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 37 (2d Cir. 1994). If the plaintiff succeeds in presenting a prima facie case of discrimination, the burden shifts to the defendant to produce, " 'through the introduction of admissible evidence,' reasons for its actions which, *if believed by the trier of fact,* would support a finding that unlawful discrimination was not the cause of the employment decision." *Hicks,* —— U.S. at ——, 113 S.Ct. at 2747 (emphasis in original) (quoting *Texas Dep't. of Community Affairs v. Burdine,* 450 U.S. 248, 255, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981) (emphasis in original)).

■ If the defendant successfully articulates such nondiscriminatory reasons, the plaintiff is given the opportunity to show that defendant's reasons were merely a pretext for discrimination. *See Chambers,* 43 F.3d at 38. The plaintiff must establish by a preponderance of the evidence "both that the reason was false, *and* that discrimination was the real reason." *Fisher v. Vassar College,* 66 F.3d 379, 392 (2d Cir.1995) (quoting *Hicks,* —— U.S. at ——, 113 S.Ct. at 2752) (emphasis in Hicks). *See Binder v. Long Island Lighting Co.,* 57 F.3d 193, 199 (2d Cir.1995); *DeMarco v. Holy Cross High Sch.,* 4 F.3d 166, 170 (2d Cir.1993) (proof that employer has supplied a false reason for its action permits fact finder to conclude defendant's actions were motivated by discrimination, but does not compel such a finding).

### A. *Plaintiff's Prima Facie Case*

■ To establish a prima facie case of racial discrimination in promotion, plaintiff must demonstrate: (1) that he belongs to a protected class; (2) that he applied and was qualified for a job for which the employer was seeking applications; (3) that, despite his qualifications he was rejected; and (4) that, after his rejection, the position remained open and the employer continued to seek applications from persons of plaintiff's qualifications. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824; *Lloyd v. WABC–TV,* 879 F.Supp. 394, 401 (S.D.N.Y.1995).

Defendant does not contest that plaintiff is a member of a protected class, or that he was rejected for the job of Expediter. Rather, defendant explains its failure to promote by claiming that plaintiff was not qualified for the job of Expediter. The Second Circuit offers the following instruction to trial courts evaluating an employee's job performance in a Title VII case:

> In determining whether an employee's job performance is satisfactory, courts may— as they often must—rely on the evaluations rendered by supervisors. After all, job performance cannot be assessed in a vacuum; the ultimate inquiry is whether an employee's performance "meets his employer's legitimate expectations." Although courts must refrain from intruding into an employer's policy apparatus or second-guessing a business's decisionmaking process, they must also allow employees "to show that the employer's demands were illegitimate or arbitrary."

*Meiri v. Dacon,* 759 F.2d 989, 995 (2d Cir.) (citations omitted), *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985); *see also Stein v. McGraw–Hill, Inc.,* 782 F.Supp. 207, 212–13 (S.D.N.Y.1992) (poor performance evaluations allow Court to draw inference that reason for termination was quality of work, and not unlawful discrimination); *Hal-*

---

violation of 42 U.S.C. § 1981 and § 296 of the New York Human Rights Law. Because the elements of proof and burdens of persuasion are the same under all three statutes, the parties only brief and argued the case with respect to Title VII. Therefore, the Court's decision as to plaintiff's § 1981 claim and § 296 claim will be determined by its decision as to plaintiff's Title VII

claim. *See Hudson v. International Business Machs. Corp.,* 620 F.2d 351, 354 (2d Cir.), *cert. denied,* 449 U.S. 1066, 101 S.Ct. 794, 66 L.Ed.2d 611 (1980) (§ 1981 claim); *Miller Brewing Co. v. State. Div. of Human Rights,* 66 N.Y.2d 937, 938, 489 N.E.2d 745, 746, 498 N.Y.S.2d 776, 777 (1985).

brook v. Reichhold Chemicals, Inc., 766 F.Supp. 1290, 1295 (S.D.N.Y.1991); Lewis v. Air France, 1990 WL 49053, at *4 (S.D.N.Y. April 18, 1990) (Mukasey, J.) ("If plaintiff cannot present evidence that would justify a jury finding that his performance was satisfactory, he cannot state a prima facie case of discrimination, and necessarily cannot show his termination was pretextual."); Plaisner v. New York Human Resources Admin., 1989 WL 31495 (S.D.N.Y. March 30, 1989) (Mukasey, J.) ("[T]he real issue is whether Plaisner's job performance meets the FHD's legitimate expectations."). Zenni has not attempted to show that Hard Rock's demands were illegitimate or arbitrary.[8] Therefore, the issue becomes whether Zenni's performance met Hard Rock's legitimate expectations. Review of the facts of the case reveals that it did not.

■ Zenni asserts that because he was employed as a Host, and because the position of Expediter was less challenging than that of Host, he was therefore necessarily qualified for the position of Expediter. There are several problems with this argument. First, it is undisputed that plaintiff had already received a customer complaint for rudeness, and been written up in a shopper's report for rudeness, within the first month of his employment,[9] before he ever expressed interest in the Expediter position. While plaintiff asserts in his affidavit and memorandum of law [10] that he asked to be promoted to Server before any employment problems occurred, this claim is directly contradicted by his deposition testimony, where he stated that he first inquired about the Server position (and was told he must first be an Expediter) about a month after being made a Host. See Zenni

Dep. at 147. "It is well settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment." Buttry v. General Signal Corp., 68 F.3d 1488, 1493 (2d Cir.1995) (quoting Mack v. United States, 814 F.2d 120, 124 (2d Cir. 1987)). Therefore, at no time did plaintiff seek promotion to Expediter with the benefit of a clean employment history at Hard Rock.

■ Zenni contends that even in light of these problems, based upon his first evaluation, which stated that, overall, he was meeting Hard Rock's expectations, he should have been promoted in January of 1992, which is the date he was allegedly told the Expediter list was abolished. But, even this first evaluation, which is undoubtedly his strongest, reaches the conclusion that his customer relations skills and his attitude towards customers and co-workers were below Hard Rock standards. Zenni concedes that these attributes are extremely important to Hard Rock. See Zenni Dep. at 181–87; Smith v. American Express Co., 853 F.2d 151, 154 (2d Cir.1988) (employee's lack of interpersonal skills and inability to get along with co-employees relevant to employers justified failure to promote); Plaisner, 1989 WL 31495, at *4 (inability to cooperate with co-workers relevant consideration in employer evaluation of employee). Within several months of the first evaluation, and less than a month after he was first eligible for promotion, his performance at work simply became worse. Finally, within eight months of the beginning of his employment, Zenni's second formal review indicated that his over-

---

8. In his deposition, Zenni repeatedly agreed that Hard Rock's expectations of friendliness, teamwork, a positive attitude, good communications skills, etc. were all legitimate expectations for a restaurant owner. See, e.g., Zenni Dep. at 181–87.

9. The Court finds that plaintiff's employment record with Dacrem is not relevant to the analysis of his claims against Hard Rock because his performance was not reviewed by Hard Rock. In addition, the interpersonal skills and teamwork skills necessary for employees inside the restaurant are presumably different. Indeed, in a self-evaluation, plaintiff stated that his teamwork skills were below Hard Rock standards because

he was "still breaking out of [his] security mode." See id. Ex. N.

10. In his affidavit, Zenni states: "In October 1991, I asked Carol Gonseth and James Strobino, both Hard Rock managers, to consider me for a position inside the restaurant. I told that them I wanted to be a server." Zenni Aff. ¶ 4. In his memorandum of law, plaintiff indicates that he requested a Server position when he originally asked about the availability of positions inside the restaurant. See Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment ("Pl's.Opp.") at 3.

all performance was not meeting Hard Rock's standards.

Zenni's only plausible argument is that he should have been promoted sometime between his first evaluation in December of 1991, and his infractions in February of 1992. But, again, performance problems had already been documented. In addition, of the employees who were selected to be Expediters during the time Zenni applied, one had six months restaurant experience, and the rest had significantly more experience. *See* Defendant's Memorandum of Law in Support of Motion for Summary Judgment at 33 (citing relevant portions of Zenni Aff.). Zenni does not make any argument explaining why Hard Rock's requirement that Expediters have restaurant experience is unnecessary, other than to say the position is an entry level one. Such a conclusory challenge to Hard Rock's employment practice is legally insufficient to create a genuine issue precluding summary judgment. *See Goenaga,* 51 F.3d at 18.

Both plaintiff and defendant assume throughout their motion papers, affidavits, and depositions, that the Expediter job is simply a stepping stone to the Server position. *See* Zenni Aff. ¶¶ 4–6, 9, 11–12, 15; Zenni Dep. 169; Supplemental Affidavit of Jack Moran ("Moran Supp. Aff.") ¶ 2, 4. Recognizing the connection between the two jobs, and understanding the demanding nature of the Server position at Hard Rock, *see* Moran Supp. Aff. Ex. A, provides justification for Hard Rock's requirement that Expediters have restaurant experience. In addition, the Hard Rock employee requirements for Server contain many qualities which plaintiff, through both supervisor and personal evaluation, was lacking. *See id.*

By the time Zenni had gained the requisite experience to be in a position to obtain the Expediter position, he had received more complaints from both co-workers and customers, been involved in a loud argument with a co-worker, and received his second formal evaluation, which indicated that Zenni's performance was no longer meeting Hard Rock's standards. *See* Zenni Aff.Ex.H; *Harriot v. Barnard College,* 1991 WL 135625,

at *4 (S.D.N.Y. July 16, 1991) (Keenan, J.) (plaintiff's multiple written and verbal warnings, and multiple suspensions, preclude establishment of prima facie case for discriminatory termination); *Plaisner,* 1989 WL 31495, at *5 (consistently deteriorating performance standards lends support to decision not to promote).

Finally, plaintiff does not supply any evidence that other people promoted to either Expediter or Server during the relevant time period had the poor performance record he did. *See Thermidor v. Beth Israel Medical Ctr.,* 683 F.Supp. 403, 414 (S.D.N.Y.1988) (because plaintiff cannot show that other employees who also had problems working with staff members were not discharged, no inference of discrimination); *cf. Gibson v. American Broadcasting Cos., Inc.,* 892 F.2d 1128, 1133 (2d Cir.1989) (summary judgment in a failure to promote case inappropriate where black plaintiff, who had received criticism from employers, provided evidence that white employees with similar employment histories were promoted more quickly). Therefore, viewing the facts in the light most favorable to plaintiff, he cannot show a prima facie case of discriminatory failure to promote because he cannot show that he was performing his duties as Host at a level meeting Hard Rock's expectations.

In an effort to establish his prima facie case of discriminatory treatment, plaintiff makes two more arguments beyond asserting his qualifications for the Expediter position. First, he presents statistics attempting to show that Hard Rock discriminated in its hiring and promoting of both Servers and Expediters. Second, he supplies an affidavit from Richard Cooper, an African–American who was made an Expediter at Hard Rock, but never promoted to Server due to performance problems which Cooper claims were merely a pretext for racial discrimination.

As an initial note, the Court believes that making these arguments to help establish a prima facie case does not fit within either the four part prima facie case test developed in *McDonnell Douglas,* or the rationale behind the test.[11] *See Furnco Const. Corp. v. Wa-*

---

**11.** Plaintiff and defendant seem to agree that presentation of the statistical evidence and the

*ters,* 438 U.S. 567, 579–80, 98 S.Ct. 2943, 2950–52, 57 L.Ed.2d 957 (1978) (language suggesting that statistical evidence in a discriminatory treatment action is not relevant to the prima facie case); *Aguirre–Molina v. New York State Div. of Alcoholism,* 675 F.Supp. 53, 60 (N.D.N.Y.1987) (statistical evidence relevant only to the issue of pretext). The key insight in *McDonnell Douglas* is the recognition that a plaintiff in a discriminatory treatment case would often have difficulty attempting to prove discrimination by showing that every legitimate reason an employer might have for reaching an employment decision was not present. Therefore, the Court created a three-part burden shifting scheme whereby a plaintiff could prove its case of the employer's discriminatory intent without any positive evidence. *See Price Waterhouse v. Hopkins,* 490 U.S. 228, 270, 109 S.Ct. 1775, 1801, 104 L.Ed.2d 268 (1989) (O'Connor, J., concurring in the judgment) ("[W]hen a number of potential causes for an employment decision are eliminated an inference arises that an illegitimate factor was in fact the motivation behind the decision."); *see also International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 358 n. 44, 97 S.Ct. 1843, 1866 n. 44, 52 L.Ed.2d 396 (1977). The *McDonnell Douglas* scheme of creating an inference of discrimination by negative proof of legitimate reasons for an employment decision does not seem to allow for positive proof of discrimination such as statistical evidence. Plaintiff wants to use these arguments to make a prima facie showing of discriminatory intent, but the entire point behind *McDonnell Douglas* is that such a showing is properly made if the plaintiff establishes that he was qualified for the job, and the job remained open for application after the plaintiff was rejected. It is this very fact which allows the inference of discrimination.[12]

The Court recognizes that there is authority in the Second Circuit which permits the use of statistical and other positive evidence to help establish a prima facie case. *See, e.g., Martin v. Citibank, N.A.,* 762 F.2d 212, 219 (2d Cir.1985); *Hudson,* 620 F.2d 351, 355 (2d Cir.1980) (statistical evidence may be used to support a prima facie case of failure to promote, but statistics alone cannot create such a prima facie case). Because the Court does not find either the statistics or Cooper's affidavit to give rise to an inference of discrimination, whether they are treated as appropriate for the prima facie case, or as evidence to show that defendant's explanation[13] for its failure to promote plaintiff is pretextual, or simply as positive proof of discriminatory intent, does not matter in this case. The evidence is insufficient to help establish a prima facie case, insufficient to show pretext, and insufficient to demonstrate discriminatory intent.[14]

The statistical evidence has many weaknesses. First, it is not supported by any expert analysis. *See Martin,* 762 F.2d at 218 (value of statistical proof is slight where the analysis conducted by the expert is weak); *Morales v. Human Rights Div.,* 878 F.Supp.

affidavit of Cooper is appropriate at the prima facie case stage. This may be because they both define the fourth part of the *McDonnell Douglas* test as "the failure to give the position occurred under circumstances giving rise to an inference of unlawful discrimination." *See* Plaintiff's Memorandum of Law at 12. However, the fourth part of the test is as follows: "[T]hat, after his rejection, the position remained open and the employer continued to seek applicants from persons of [plaintiff's] qualifications." *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824.

**12.** Plaintiff offers statistical evidence and the affidavit of Cooper to bolster his argument that he has satisfied the *McDonnell Douglas* prima facie case standard. However, this positive proof is not probative of the essential element of the prima facie case missing here—that plaintiff was qualified.

**13.** As is clear from the Court's conclusion that plaintiff is not qualified for promotion, if, *arguendo,* plaintiff had established a prima facie case, defendant has met its burden of producing a legitimate, non-discriminatory explanation for its employment decision—that plaintiff is unqualified.

**14.** If a plaintiff offers sufficient positive proof that defendant's discriminatory intent at least partly motivated the employment decision, the *McDonnell Douglas* burden-shifting scheme does not apply. *See Price Waterhouse,* 490 U.S. at 244–47, 109 S.Ct. at 1787–89. While plaintiff has not made a *Price Waterhouse* argument in this case, even if he had, his positive proof falls far short of demonstrating that defendant's motivation for failing to promote him was at least in part discriminatory.

653, 658 (S.D.N.Y.1995). Second, plaintiff's sample is small, meaning that small changes in hiring may prompt dramatic statistical fluctuations, making statistical analyses untrustworthy in this situation. *See Beers v. NYNEX Material Enters. Co.*, 1992 WL 8299, at *7 (S.D.N.Y. January 13, 1992). Third, and most important in this case, statistical evidence of an employer's general hiring practices is insufficient to prove that a particular plaintiff was discriminated against. *See Zahorik v. Cornell Univ.*, 729 F.2d 85, 95 (2d Cir.1984) (evidence showing that a greater percentage of male candidates than female candidates were granted tenure is insufficient to show that individual plaintiff's discriminated against); *Hudson*, 620 F.2d at 355 (statistical evidence alone cannot create a prima facie case of discriminatory treatment).[15]

Plaintiff's attempt to prove discriminatory intent through the affidavit of one other African–American employee of Hard Rock is equally unpersuasive. First, while Cooper was denied a promotion to the Server position, he was promoted to an Expediter position, the very position plaintiff claims to have been denied because of his race. *See* Cooper Aff. ¶ 2. After being appointed to the Expediter position, Cooper claims that Hard Rock began to view him as a discipline problem in order to prevent him from becoming a Server. Indeed, Cooper states that all six of the disciplinary incidents he was involved in occurred after being named an Expediter. *See id.* ¶ 3. Even if true, his assertion that these disciplinary problems were "minor" and "wholly unjustified" is merely "conjecture" and "surmise" and will not defeat a motion for summary judgment. *See Goenaga*, 51 F.3d at 18. The fact that other African–Americans were succeeding at Hard Rock, *see* Affidavit of Larry Doby, Jr. ¶ 3, Def. 3(g) ¶¶ 90–93, further undercuts the reliability of Cooper's speculative assertions.

In sum, because plaintiff's performance was not meeting Hard Rock's legitimate expectations, he cannot establish a prima facie case of discrimination. The Court believes that plaintiff's offering of statistical evidence

and the affidavit of Cooper could never overcome this fact because they are not probative of his qualifications for the job. *See Lewis v. Air France*, 1990 WL 49053, at *4 ("If plaintiff cannot present evidence that would justify a jury finding that his performance was satisfactory, he cannot state a prima facie case of discrimination, and necessarily cannot show that his termination was pretextual."). Even if one assumed this kind of evidence could overcome plaintiff's lack of qualifications, the visceral appeal of such an argument disappears on further analysis. Therefore, plaintiff's Title VII claim for failure to promote must fail.

### III. *Plaintiff's Retaliation Claim*

■ Section 704(a) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–(3)(a) states that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has made a charge ... under this title." Zenni asserts that Hard Rock unlawfully retaliated against him after he filed his first charge with the EEOC on November 16, 1992. "[T]he distribution and allocation of burdens of proof in retaliatory discharge claims follow the general disparate treatment analysis set forth in *McDonnell Douglas Corp. v. Green* ...". *Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1038 (2d Cir.1993). However, a finding of retaliation does not depend upon the merits of the underlying discrimination complaint. *See Davis v. State Univ. of New York*, 802 F.2d 638, 642 (2d Cir.1986). In order to support a prima facie case of retaliation under Title VII, plaintiff must show that: (1) he was engaged in a activity protected under Title VII; (2) the employer was aware of plaintiff's participation in the protected activity; (3) the employer took an adverse employment action against the plaintiff; and (4) a causal connection existed between the plaintiff's protected activity and the employer's adverse action. *See Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d at 1039 (citing *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 208–09 (2d Cir.1990); *see also Tomka v. Seiler Corp.*, 66 F.3d 1295, 1308 (2d Cir.1995). In this case, only part four of the prima facie

---

**15.** Regardless, defendant provides evidence that of the six people promoted to expediter during the period plaintiff sought the position, two of whom were African–American. *See* Def's. 3(g) ¶¶ 92, 93; Zenni Dep. at 201, 449.

case is disputed; defendant contends that there is no causal connection between plaintiff's filing of an EEOC charge in November 1992, and his treatment thereafter, including his termination in December of 1993. A causal connection may be established either "*indirectly* by showing that the protected activity was followed closely by discriminatory treatment, or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct, or *directly* through evidence of retaliatory animus directed against a plaintiff by the defendant." *Johnson v. Palma*, 931 F.2d 203, 207 (2d Cir.1991) (quoting *DeCintio v. Westchester County Medical Ctr.*, 821 F.2d 111, 115 (2d Cir.1987) (citations omitted)). Plaintiff has supplied no evidence of retaliatory animus directed toward him, nor has he shown disparate treatment of other similarly situated employees. Therefore, any claim he might have must go forward based upon a showing that the filing of his EEOC charge was followed closely by discriminatory treatment.

■ Plaintiff offers four examples of adverse action taken by Hard Rock after the filing of his EEOC charge. First, he states that his third performance evaluation, given less than one month after the filing of the charge, was "a totally negative evaluation," *see* Pl's.Opp. at 24, despite the fact that just before the filing of the charge Hofing told him he had been rejected from the Expediter position because his performance had been "flat." Zenni's argument does not persuade. First, while the third evaluation was his worst, it was not markedly worse than the one he received six months earlier, where it was concluded that he was not performing up to Hard Rock's standards. *See* Zenni Dep. Exs. H & I; *Lawson v. Getty Terminals Corp.*, 866 F.Supp. 793, 804 (S.D.N.Y.1994) (employer's criticisms of employee's performance before employee engaged in protected activity relevant to finding that employee did not display the causal nexus necessary for establishment of a prima facie case); *James v. Runyon*, 843 F.Supp. 816, 826 (N.D.N.Y. 1994) (where plaintiff fails to produce any evidence that negative evaluations received were the result of protected activity, causal nexus requirement not met). In addition, the third evaluation does make some positive comments, and it proposes bi-monthly meetings to work on the performance problems. Finally, Zenni concedes that after filing the charge his attitude became worse. While he states that this shift in attitude was due to Hard Rock creating a hostile work environment, it should not be surprising that his subsequent evaluation was more critical of his attitude.

Second, Zenni asserts that "particularly after he had filed his first EEOC Charge," *see* Pl's.Opp. at 22, defendant subjected him to a hostile work environment. He claims that if his performance worsened, defendant cannot use this fact as a justification for failing to promote him. Plaintiff offers no evidence whatsoever to support this claim. His strongest statement is as follows: "Immediately following upon the filing of the EEOC Charge, the attitude of management and certain of my fellow employees toward me became decidedly negative. From that day forward, I worked in an entirely hostile environment." Zenni Aff. ¶ 16. Such a statement is clearly insufficient to support a hostile work environment claim. Indeed, plaintiff does not allege that a single racially derogatory remark or action was ever made to him. *Cf. Snell v. Suffolk County*, 782 F.2d 1094, 1102–03 (2d Cir.1986) (proliferation of demeaning literature and epithets were sufficiently continuous and pervasive to establish a hostile work environment); *see also Vaughn v. Pool Offshore Co., etc.*, 683 F.2d 922, 924 (5th Cir.1982) ("[A] discriminatory and offensive work environment, 'so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of minority group workers,' in itself may constitute a violation of Title VII.") (quoting *Rogers v. EEOC*, 454 F.2d 234, 238 (5th Cir.1971), *cert. denied*, 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972)).

Zenni also states that the suspension which resulted from a customer complaint in January of 1993 was retaliatory. Zenni asserts that the charge levied by the customer was untrue, and that another employee would support his version of the events. *See* Zenni Aff. ¶ 19. However, as stated earlier, neither Zenni's affidavit nor the fellow employee's letter describing the event claim that the customer's allegation that Zenni was rude is untrue. *See id.*; Moran Aff.Ex. 8. And,

because of Zenni's prior infractions, his suspension simply followed Hard Rock policy.

Finally, Zenni alleges that his termination was retaliatory. Again, he fails to provide sufficient evidence to meet the causal nexus requirement. First, his ultimate termination was more than a year after he filed the EEOC complaint. Because the Court found no retaliation in plaintiff's third evaluation, his suspension, or in the allegedly hostile environment, a full year passed between the filing of the charge and this allegation of retaliatory conduct. Therefore, this is not a situation where the exercise of Title VII rights was "closely followed" by an adverse employment action. *See Lees v. Case–Hoyt Corp.,* 779 F.Supp. 717, 726–27 (W.D.N.Y. 1991); *cf. Tomka,* 66 F.3d at 1308 (termination three months after promise that salary and benefits would be continued until after recovery from assault sufficient to create an inference of discrimination.); *see also Davis,* 802 F.2d at 642. More importantly, Hard Rock supplied ample evidence that plaintiff's termination was in fact due to his admittedly worsening attitude and the events of November 7, 1993. Hard Rock, by this time, had an employee who: (1) according to both management evaluations and self-evaluations, was performing below their standards; (2) had a history of performance problems; (3) had an admittedly deteriorating attitude; and (4) after receiving another complaint from a customer and threatening a fellow employee with physical violence, requested a leave of absence. Thus, plaintiff cannot make a prima facie case of retaliatory termination. Moreover, even if he could, plaintiff does not offer any argument for why defendant's proffered reasons for termination, namely the information listed above, was not the real reason for the decision to terminate.

### CONCLUSION

For the reasons stated above, defendant's motion for summary judgment is granted in its entirety. The action is dismissed.

**SO ORDERED.**